STOKER, Judge.
The plaintiffs, Barney and Bettye Cabra, filed suit against the defendant, Great American Reserve Insurance Company, following its denial of coverage for medical and hospitalization benefits under a policy of health insurance previously issued to plaintiffs. The trial court awarded judgment in favor of the plaintiffs and against the defendant in the amount of $10,622.48, but denied the plaintiffs’ claim for penalties and attorney’s fees. The defendant has appealed the trial court’s judgment. The defendant asserts on appeal that:
(1) the trial court erred in finding that the plaintiffs had not intentionally misrepresented the claimant’s medical condition on the application for health insurance;
(2) the trial court erred in not finding that the claimant’s back condition was a “pre-existing condition” within the terms and provisions of the policy of health insurance;
(3) the trial court erred in basing its judgment, at least in part, on the alleged statement of one witness that he believed the claim should have been paid; and,
(4) the trial court erred in rendering judgment awarding to plaintiffs the sum *634 of $10,622.48, which sum exceeds the benefits payable pursuant to the policy of health insurance.
The issues presented for review are (1) whether Barney Cabra made misrepresentations with intent to deceive on an application for a policy of health insurance which materially affected either the acceptance of the risk or the hazard assumed by the insurer, and (2) whether Bettye Cabra’s degenerative disc disease is a preexisting condition within the terms and provisions of the policy of health insurance issued by the defendant.
FACTS
On February 18, 1985 Barney Cabra filled out an application for health insurance to be issued by Great American Reserve Insurance Company. Bruce Gandy, an agent with the Vandegaer Insurance Agency in Many, Louisiana, assisted Mr. Cabra in completing the application. The standard procedure was that the agent asked the questions on the application and filled in the responses as provided by the applicant. The insurance policy was to be issued to cover both Mr. and Mrs. Cabra. Mrs. Cabra, however, was not with her husband when the application was filled out. Mr. Cabra answered in the negative all of the questions concerning any history of disease, illness or treatment. In response to the question concerning any hospitalizations in the past five years, he listed his surgery in 1984. In response to the question concerning whether they , had been treated by or consulted with a physician in the past two years, he listed a doctor visit for Mrs. Cabra, which was for a physical checkup in 1984. He indicated that the report from the physician was good. Thereafter, a policy of health insurance was issued with an effective date of March 7, 1985.
Mrs. Cabra was admitted into Schumpert Medical Center in Shreveport on May 31, 1985, where she underwent surgery for the excision of a ruptured disc at L-4, L-5. Subsequent to her discharge from the hospital, Mrs. Cabra submitted a claim form to the defendant for hospitalization and medical benefits due under their policy. She indicated on the form that her problem began on approximately May 1, 1985, and that she first sought medical treatment for it on May 21, 1985. In response to the question concerning whether the claimant had received any other medical attention during the past five years, Mrs. Cabra answered no.
The defendant decided to investigate the claim further because the major surgery occurred so soon after the policy was issued. In the course of this investigation, a representative of the defendant telephoned Mrs. Cabra in September concerning the claim. Mrs. Cabra told this person that she had a deteriorating disc and that she had been seeing a chiropractor for years. It was discovered that Mrs. Cabra’s orthopedic surgeon had treated her for a problem with the L-4, L-5 disc in 1979 and 1980. Based upon the information which was obtained during the investigation, the defendant wrote to the plaintiffs informing them that the claim was being denied due to the fact that they had failed to disclose that Mrs. Cabra had been treated previously for the disc problem. The defendant gave the plaintiffs the option of maintaining the policy in force, subject to a rider which would exclude coverage for Mrs. Cabra’s back problems, or rescinding the contract and having their premiums returned. The plaintiffs did not sign and return the rider to the defendant; accordingly, the policy was canceled and the premiums were returned. This lawsuit was subsequently filed by the plaintiffs.
APPLICABLE LEGAL PRINCIPLES
Our brethren on the Second Circuit Court of Appeal recently summarized the legal principles applicable to an insurer’s defense available under LSA-R.S. 22:619 B in Jones v. United Savings Life Insurance Company, 486 So.2d 1110 (La.1986). The court said at pages 1113 and 1114:
“ ‘LSA-R.S. 22:619 provides:
A. Except as provided in Subsection B of this Section and R.S. 22:692, and R.S. 22:692.1, no oral or written misrepresentation or warranty made in the nego *635 tiation of an insurance contract, by the insured or in his behalf, shall be deemed material or defeat or void the contract or prevent it attaching, unless the misrepresentation or warranty is made with the intent to deceive.
B. In any application for life or health and accident insurance made in writing by the insured, all statements therein made by the insured shall, in the absence of fraud, be deemed representations and not warranties. The falsity of any such statement shall not bar the right to recovery under the contract unless such false statement was made with actual intent to deceive or unless it materially affected either the acceptance of the risk or the hazard assumed by the insurer.’ ”
“To avoid liability on the grounds of misrepresentation in the application, it must be shown that the material misrepresentations were made fraudulently or with the intent to deceive the insurer and that the misrepresentations materially affected the risk assumed by the insurer. Louisiana jurisprudence requires proof of both factors and the burden of proof is on the insurer. Due to the inherent difficulties in proof of intent, strict proof of fraud is not required to show the applicant’s intent to deceive. The intent to deceive is determined from the surrounding circumstances which indicate the insured’s knowledge of the falsity of the representations made in the application and his recognition of the materiality of his misrepresentations or from circumstances which create a reasonable assumption that the insured recognized the materiality. In order for the misrepresentations made by the applicant to be found material, they must have affected the acceptance of the risk by the insurer. The test of materiality is whether the knowledge of the facts would have influenced the insurer in determining whether to assume the risk or in fixing premiums.
“Even if the information supplied by the applicant was false, if the insurer would have issued the policy anyway, then it is not material. False statements in answer to questions as to consultations with physicians and hospitizations have been held to be material.
“Therefore, the insurer bears a three-tiered burden of proof. First, it must be shown that the applicant’s statements were false. Second, the insurer must establish that the misrepresentations were made with an actual intent to deceive. Third and finally, the insurer must establish that these misstatements materially affected the risk assumed by the insurer.” (Citations omitted.)
We must now analyze the facts and circumstances of this case to determine whether the defendant met this three-tiered burden of proof in order to escape liability.
FALSITY OF STATEMENTS
The defendant has alleged that the information given on the insurance application was false. Primarily, the false information consisted of the statement that the insureds had no history of rheumatism, arthritis, or disease of the muscles, bones, joints, or spine. They additionally failed to disclose other treatment received by Mrs. Cabra, including regular chiropractic treatment.
Dr. J. Lee Etheredge, in his deposition testimony, stated that he first saw Mrs. Cabra on May 5, 1979, the day after she had been involved in an automobile accident. Mrs. Cabra complained of neck and back pain at that time. Dr. Etheredge found that Mrs. Cabra had tenderness in the lumbar back at L-5. X-rays were taken of Mrs. Cabra’s back which revealed that she had mild degenerative changes in the lumbar spine. Dr. Etheredge said that Mrs. Cabra had some signs of mild disc disease or degenerative disc disease at L-4, L-5 and that the disc had been weak prior to the accident. His diagnosis was that as a result of the accident she sustained a sprain which was superimposed on degenerative changes. Dr. Etheredge continued to treat Mrs. Cabra through 1980. In June of 1980, Dr. Etheredge assigned a 5% permanent physical impairment to Mrs. Cabra as a result of the aggravation of her preexisting degenerative changes.
*636 Dr. Etheredge saw Mrs. Cabra again in March of 1981 at which time he treated her for a fractured left fibula. On June 7,1984 Dr. Rambach, an associate of Dr. Ether-edge, treated Mrs. Cabra for a contusion to her left hand which she sustained in a bumper car mishap.
Mrs. Cabra went to see Dr. Etheredge on May 22, 1985 with complaints of leg pain and low back pain at L-4, L-5. X-rays taken at that time revealed mild to moderate degenerative disc disease. Dr. Ether-edge stated that this was the same problem that he found in 1979 except that the disc had gone from bulging to ruptured. He said that the disc was not normal and the changes were simply a matter of degree. The L-5 disc was removed surgically in June of 1985.
Additionally, at trial, both Mr. and Mrs. Cabra testified that Mrs. Cabra had been receiving chiropratic treatment for many years and that any problems experienced by Mrs. Cabra between 1980 and 1985 were taken care of by the chiropractor.
It is clear that the information provided by Mr. Cabra to the defendant on the application was inaccurate and incomplete. We conclude that the statements made on the application and claim form were indeed false.
MATERIALITY
Our second inquiry is whether the defendant has shown that these misstatements were material, i.e., whether the knowledge of the facts would have influenced the insurer in determining whether to assume the risk or in fixing premiums.
It was established by testimonial and documentary evidence that the defendant denied the claim for benefits, but offered to continue the policy in effect, subject to a rider with exclusionary language covering Mrs. Cabra’s back problems.
Charles Costa, vice-president of insurance operations for the defendant, testified at trial concerning the defendant’s practices. Mr. Costa testified that the medical information provided on the application is used to determine whether to issue the policy as applied for, to decline the policy altogether, or to issue a rider which is attached to the policy.
When asked what the company would have done had a back problem been indicated on the application, Mr. Costa testified that it would depend on the severity of the problem, and in this case, based upon Mrs. Cabra’s medical history, a rider would have been attached to the policy. The rider would have specified for exclusion from coverage any disease or injury to the lum-bosacral and/or sacroiliac spine, adjacent muscles and tissues, including complications thereof. This type of rider was sent to the Cabras in October of 1985 to be signed and returned to the defendant. The rider was never returned to the defendant.
Mr. Costa stated that had the defendant known about Mrs. Cabra’s prior health history, the policy would not have been issued as applied for. In the Cabras’ case, there was no indication of a prior health problem and neither Dr. Etheredge nor the chiropractor were named on the application. Based on the information provided, the defendant had no reason to further investigate the applicants’ health history.
It is apparent from the defendant’s action and the testimony of Mr. Costa that the failure to provide information concerning Mrs. Cabra’s back problem was material to the risk assumed by the defendant. As Mr. Costa testified, had the defendant known about the condition, it would have specifically excluded the precise claim for which benefits were sought.
INTENT
The trial court, in its reasons for judgment, concluded that there had been no intentional misrepresentations by Mr. Ca-bra. The trial court stated:
“[I]n Mr. Cabra’s view there was no misrepresentation at all. He certainly did not understand his wife’s five-year old back ‘condition’ to be a ‘disease of the spine.’ The evidence reflects that Mrs. Cabra led a normal, active life after her injury of 1981 [sic], in which she suffered [a] back injury, until shortly prior to be *637 ing admitted to the hospital. Mr. Bruce Gandy, agent for Defendant, Great American, felt that the claim should have been paid.”
Mr. Cabra testified that he knew that his wife had had back problems at the time that he filled out the application. He knew that the problem was a deterioration of the disc and that she had low back pain from time to time between 1979 and 1985. However, he did not consider the deterioration of the disc to be a disease, and any problem that his wife had with back pain was taken care of by a chiropractor. Mr. Cabra said that he had forgotten about the other incidents of medical treatment between 1980 and 1985, and that is why he did not list them. Yet, Mr. Cabra failed to indicate that his wife felt the need to seek treatment from a doctor of chiropractic for so many years, both before and after the diagnosis of degenerative disc disease in 1979.
The information which was omitted from the application would have led to discovery of the medical history, which was ultimately disclosed, prior to the acceptance of the plaintiffs’ application for health insurance. The information was material to the very risk involved here, which the defendant would not have assumed had it known of it. The representations made on the application depict Mrs. Cabra as having enjoyed good health, when in fact she had a history of back trouble, had been seeing a chiropractor, and required back surgery less than three months after the policy of insurance was issued.
Mr. Cabra testified that he understood the purpose for the questions asked on the application and that a rider would be given if the applicant had any of the specific problems mentioned. He did not remember discussing Mrs. Cabra’s back problem with the insurance agent at the time the application was made. Mr. Cabra apparently saw no need to mention his wife’s “condition” and chiropractic treatment in conjunction with the application. We fail to see the distinction between Mr. Cabra’s perception of what constitutes a disease and his wife’s “condition.”
We believe that the fact that neither Mrs. Cabra’s prior back problem was even mentioned nor her chiropractic treatment listed on the application and the obvious materiality of this information, that the requisite intent to deceive was proven. The facts and circumstances lead us to the conclusion that Mr. Cabra knew that the information he gave was false and he recognized the materiality of the information. We find that the trial court was clearly wrong in finding no intentional material misrepresentation.
PREEXISTING CONDITION
Because we have concluded that the defendant proved the necessary elements to escape liability under LSA-R.S. 22:619 B, this pretermits any discussion of the existence of a preexisting condition.
CONCLUSION
For the reasons stated herein, the judgment of the trial court is reversed, vacated and set aside and the plaintiffs’ suit is hereby dismissed with prejudice. The costs of this appeal are assessed to the plaintiffs.
REVERSED.